**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ANDREW MORGAN on behalf of himself and all other Plaintiffs similarly situated known and unknown,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **No. 05 C 5795** |
| **SPEAKEASY, LLC, THE ROOM OF CHICAGO d/b/a SOUTH, and JODY ANDRE, individually,** ) ) ) ) ) | **Judge Nan R. Nolan** |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Andrew Morgan filed suit on behalf of himself and a class of individuals similarly situated alleging that Defendants SpeakEasy, LLC, The Room of Chicago d/b/a South ("South"), and Jody Andre violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, by failing to pay their wait staff minimum wages. Morgan also charges Defendants with unjust enrichment based on their practice of forcing employees to share tips with managers. On January 31, 2006, the district court approved the parties' Agreed Form of Notice to Similarly-Situated Persons Pursuant to 29 U.S.C. § 216(b). Morgan sent the notice to some 46 current and former employees of SpeakEasy and South, but none of them chose to opt-in to the case. Thus, Morgan is pursuing this lawsuit solely on his own behalf.

The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment on all of Morgan's claims. For the reasons set forth here, the motions are granted in part and denied in part.

**BACKGROUND**

SpeakEasy is an Illinois limited liability company owned by Defendant Andre and three other individuals not involved in this lawsuit. On June 3, 2003, SpeakEasy began operating as a restaurant called SpeakEasy Supper Club, located at 1401 West Devon in Chicago, Illinois.[1] (Def. Facts ¶ 1; Pl. Facts ¶ 2.)[2] South is an Illinois corporation licensed to do business as a restaurant in the city of Chicago. The restaurant, located at 5900 North Broadway in Chicago, first opened in April 2001 under the name The Room of Chicago. In August 2004, the restaurant began doing business as South, but subsequently closed its doors on January 1, 2006. (*Id.* ¶ 2.)

Andre was the sole owner and shareholder of South, and she managed and operated both South and SpeakEasy. (*Id.* ¶¶ 2, 3.) According to Andre, she conducted these management duties as an employee of Don't Speak, Inc., which hired her out as a consultant to the restaurants. (*Id.* ¶ 3; Andre Dep., at 97.) By approximately April 2005, however, Andre stopped receiving compensation from Don't Speak because SpeakEasy and South were doing poorly and she "chose not to take [a consulting fee]." (Andre Dep., at 100-02.) The parties agree that Andre was the "ultimate authority" at both SpeakEasy and South, responsible for the day to day operations of both restaurants, including hiring and firing employees; directing and supervising employee work; signing the corporations' checking and payroll accounts; and participating in decisions regarding employee compensation and capital expenditures. (Pl. Facts ¶ 8.)

**A.    Morgan's Employment**

Sometime prior to June 14, 2005, Morgan applied for a job as a waiter at SpeakEasy. Andre hired him to work as a server at South instead, beginning June 14, 2005 until he gave notice of his

---

[1]    It appears that SpeakEasy Supper Club is no longer in business, though neither party indicates when it closed.

[2]    Defendants' Statement of Material Facts is cited as "Def. Facts ¶ __." Plaintiff's Statement of Material Facts is cited as "Pl. Facts ¶ __."

resignation on September 19, 2005, effective October 2, 2005. Morgan claims that he was also employed as a server for SpeakEasy and Andre at that time, but Defendants deny this assertion. (Def. Facts ¶ 4; Pl. Resp. ¶ 4; Pl. Facts ¶¶ 5, 9, 10.)[3] The parties also disagree as to the extent to which SpeakEasy and South were interrelated. Morgan claims that the restaurants shared employees on a weekly basis, including managers, servers, line cooks, and dishwashers. He also contends that the restaurants shared supplies, such as napkins, wine glasses, and bar napkins. (Pl. Facts ¶¶ 12, 13.) Defendants deny these assertions, but do not cite any supporting evidence. Andre testified, moreover, that several employees worked at both restaurants, and she acknowledged that it was possible that she had sent a busboy or dishwasher from one restaurant to the other to help cover no-shows. (Def. Resp. ¶¶ 12, 13; Andre Dep., at 59-60, 77.)[4]

In any event, the parties agree that upon hiring new employees such as Morgan, Andre explained to them the restaurant's operations and procedures. She discussed how many shifts they wanted to work; what their first day would be like; what to wear; when training would occur and by whom; and what they would learn in their first few days. Andre also distributed a handout explaining the restaurant's opening and closing procedures, which was identical for both SpeakEasy and South. (Pl. Facts ¶ 11; Def. Resp. ¶ 11.) Andre insists that she also explained to the employees the restaurant's "well-known" policy that food ordered at the restaurant would be credited against the servers' compensation. (Def. Facts ¶ 13.) Morgan testified, however, that Andre never discussed a meal policy with him, and Andre herself could not recall any meetings during which she discussed the restaurant's rules regarding employee meals. (Morgan Dep., at 130-31; Andre Dep., at 118.)

---

[3] Plaintiff's Response to Defendants' Statement of Material Facts is cited as "Pl. Resp. ¶ __."

[4] Defendants' Response to Plaintiff's Statement of Material Facts is cited as "Def. Resp. ¶ __."

## B.    Defendants' Payment Records

Defendants used several different records to keep track of the hours worked by each employee and the gratuities paid to them.  At the close of business each night, the senior server completed a "Nightly Closing Form" identifying the name of each server present that evening and the tips each received.  (Def. Facts ¶ 6; Def. Add'l Facts ¶ 42.)[5]  In addition, Andre maintained Excel "Daily Sales Sheets" for South  identifying each staff member working each night, the hours each worked, and the tips each received.  (*Id.* ¶ 7.)  Defendants claim that Andre also instructed servers to fill out time cards reflecting the number of hours they worked each week.  (*Id.* ¶ 8.)  Morgan denies this but admits that he kept time cards for his first few weeks of employment.  (Pl. Resp. ¶ 8.)

Though Morgan admittedly stopped filling out time cards a few weeks after he started work, he apparently started keeping track of his time on his own beginning in late July or early August. Entries prior to that time were based on Morgan's memory, and he acknowledges that they are not entirely accurate.  (Def. Facts ¶ 11; Pl. Resp. ¶ 11.)

## C.    Morgan's Compensation Plan

The primary dispute in this case is whether Morgan was paid the applicable minimum wage for all hours he worked as a server.  Defendants claim that Morgan received the following forms of compensation during his employment at South: (1) regular wages; (2) tips; and (3) meal compensation.

### 1.    Wages

Defendants claim that Morgan received "wages" each week as required by law.  It is clear, however, that he did not always receive cash payments.  In certain weeks, Defendants instead

---

[5]    Defendants' Statement of Additional Material Facts is cited as "Def. Add'l Facts ¶ __."

withheld amounts they characterize as wages "for payroll taxes."  (Def. Facts ¶ 23.)  Specifically, Defendants claim that South withheld Morgan's wages to cover taxes as follows:

> $100 for the pay period of June 13 - 26
> $140 for the pay period of June 27 - July 10
> $110 for the pay period of July 11 - 24
> $312 for the pay period of September 5 - 18

(*Id.* ¶¶ 23-29.)  In support of this assertion, Defendants cite a 2005 W-2 Wage and Tax Statement indicating that South withheld a total of $662 in federal income tax, social security tax, medicare tax, and state income tax from Morgan's 2005 wages.  (Ex. 15 to Def. Facts.)

Morgan disputes that South withheld any amounts for payroll taxes, noting that Andre did not testify to such an arrangement at her deposition.  Morgan also argues that, if Defendants did withhold such amounts, they deducted more than he actually owed in taxes based on his income.  (Pl. Add'l Resp. ¶¶ 56-58.)[6]  Notably, Defendants have not provided any underlying documentation demonstrating the manner in which South calculated and/or applied the above payments towards Morgan's tax withholdings.  Morgan, moreover, has submitted a Wage and Income Transcript from the Internal Revenue Service ("IRS") indicating that South did not pay any payroll taxes on Morgan's behalf in 2005 at all.[7]  (Ex. A to Pl. Motion to Supplement; Pl. Supp. to Add'l Facts ¶ 13.)[8]

Defendants find this omission irrelevant, noting that Morgan's W-2 form from South did not include his social security number because he repeatedly declined to provide it to them.  (Andre Aff., Ex. 3 to Def. Facts, ¶ 9.)  In Defendants' view, "any request for wage and tax statements from the IRS using Plaintiff's social security number [thus] would not include payments made by South."

---

[6]     Plaintiff's Response to Defendants' Statement of Additional Material Facts is cited as "Pl. Add'l Resp. ¶ __."

[7]     Defendants object to the introduction of this exhibit, but the court grants Morgan's motion to supplement the record.

[8]     Plaintiff's Supplemental Additional Statement of Material Facts is cited as "Pl. Supp. Add'l Facts ¶ __."

(Def. Opp. to Supp. to Add'l Facts ¶ 7; Def. Resp. to Supp. to Add'l Facts ¶ 13.)[9]  Defendants also

claim that after South ceased operations in January 2006, the restaurant entered into a payment

plan with the IRS regarding outstanding payroll taxes due, including tax payments for 2005.

Defendants speculate that "[t]his payment plan likely superseded any wage and tax statements

issued by the IRS for South."  (*Id.* ¶ 8; Def. Resp. to Supp. to Add'l Facts ¶ 13.)

In other weeks, Morgan received cash payments, though the parties dispute that they

constituted "wages."  They also dispute when the wages were paid, and what hours of work they

covered, as discussed later in this opinion.

### 2. Tips

SpeakEasy and South both used a tip pool for their servers, and each server was supposed

to receive a pro rata share of the total tips based on the number of hours worked.  (Def. Facts ¶ 15;

Pl. Facts ¶ 19.)  Morgan was employed as a regular, or junior, server, but SpeakEasy and South

also employed senior servers who shared in the tip pool.  Senior servers had more seniority and

experience, as well as greater responsibilities within the restaurants.  Specifically, senior servers

helped with closing, occasionally served food and drinks to tables, served as greeters, and checked

on tables during the dinner service.  (*Id.* ¶ 14.)  Defendants view senior servers as hosts or maitre

d's, and emphasize that Andre retained the ultimate management authority.  (*Id.* ¶ 16.)  Morgan

concedes that senior servers did not have authority over hiring, firing, or scheduling, but he believes

they were managers nonetheless, stressing that their duties included directing and supervising

employees' work; handling complaints; operating the restaurants' safes; handling money;

completing the restaurants' Nightly Closing Forms; sending employees home; contacting Andre

when the restaurant needed additional staff or supplies; taking inventory; and maintaining the

restaurants' cleanliness.  (Pl. Resp. ¶¶ 14, 16; Pl. Facts ¶ 23.)

---

[9]      Defendants' Response to Supplemental Additional Statement of Material Facts is cited as "Def. Resp. to Supp. to Add'l Facts ¶ __."

It is undisputed that senior servers participated in the tip pool, and that they were paid an additional $20 per night for their work. (Def. Facts ¶ 14; Pl. Facts ¶ 24.) One of those senior servers, David Williamson, helped deliver food and drinks to tables and also served as a greeter. (*Id.* ¶ 17.) Morgan insists that Williamson performed these tasks in the capacity of manager, citing Williamson's affidavit that his job at South was "principally that of a supervising manager. That means that I was customarily the highest ranking employee at the restaurant when I was working and was generally in sole charge of the restaurant on those work days." (Williamson Aff. ¶ 4; Pl. Resp. ¶ 17.) Morgan notes, further, that Williamson had keys to the restaurant and "supervise[d] and direct[ed] the work of employees at South." (*Id.*)

Keila Herrington, another employee Defendants characterize as a senior server, had the same responsibilities as Williamson, but she also had a business card identifying her as a "manager." (Pl. Facts ¶ 26; Def. Resp. ¶ 26.) Andre acknowledged that Herrington "was a manager for a short time," but claimed that it was "more of a title than it was a responsibility." (Andre Dep., at 72; Def. Add'l Facts ¶ 50.) Herrington participated in the tip pool with the other servers. (Pl. Facts ¶ 27.)

On some occasions, South did not have enough money at the end of the evening to pay Morgan and the other employees their earned tips. When this occurred, the senior server would make a notation on the Nightly Closing Form indicating that certain employees were "owed" tips. Defendants would then pay the "owed" tips to employees at a future date, either in cash or with a check from one of the restaurants' operating accounts. (Pl. Facts ¶ 21.)

### 3. Meals

Defendants claim that Morgan also received compensation in the form of meals at the restaurants. According to Defendants, "[f]ood ordered at these restaurants is credited against servers' compensation," and "[t]he food items are valued by the cost of the food and production time." (Def. Facts ¶ 13; Def. Add'l Facts ¶ 46; Andre Dep., at 146.) Morgan acknowledges that he

ate some meals at the restaurants, and that he could not eat meals there free of charge "any time" he wanted. Morgan insists, however, that he had no idea the meals he ate "while on the clock" were being credited against his compensation. (Pl. Resp. ¶ 13; Pl. Add'l Resp. ¶ 46; Morgan Dep., at 130, 134.) He notes, for example, that in the first few days of a new hire's employment, South chefs prepared complimentary dishes for the new and existing employees to taste. (Pl. Facts ¶ 32.) In addition, on June 15, 2005, Morgan ate food from South as part of his training. (Pl. Add'l Facts ¶ 11.)

Morgan also objects that the meal tickets Defendants produced reflect the retail cost, or menu price, of the meals. He further objects that Defendants do not know the actual cost of the meals he ate and have no supporting documentation. (Pl. Facts ¶¶ 33, 34.) Defendants reiterate that meal compensation was "valued by the cost of the food and production time; profits are not accounted for," but Andre conceded at her deposition that she had no idea as to the actual cost of the food Morgan ate. (Def. Resp. ¶ 33; Pl. Resp. ¶ 13; Andre Dep., at 210-15.) Defendants do not have any old menus from South indicating the retail prices of the items at issue. (Pl. Add'l Facts ¶ 12.)

**D.    Morgan's Hours of Work**

The parties generally do not dispute the number of hours Morgan worked each week, as summarized below.

**1.    Morgan's Hours at South**

The parties agree that Morgan worked the following hours at South between June 14 and September 19, 2005:

| Week Ending | Hours Worked | Total Weekly Hours |
|---|---|---|
| June 19 | 4 hours on June 14<br>4 hours on June 15 | 8 hours |
| June 26 | 8 hours on June 24<br>8 hours on June 25 | 16 hours |

| | | |
|---|---|---|
| July 3 | 8 hours on July 1 | |
| | 7 hours on July 2 | 15 hours |
| July 10 | 6 hours on July 6 | |
| | 8 hours on July 9 | |
| | 6 hours on July 10 | 20 hours |
| July 17 | 6 hours on July 16 | |
| | 4 hours on July 17 | 10 hours |
| July 24 | 3 hours on July 18 | |
| | 7 hours on July 22 | |
| | 7 hours on July 23 | 17 hours |
| July 31 | 8 hours on July 29 | |
| | 6 hours on July 30 | |
| | 3 hours on July 31 | 17 hours |
| August 7 | 4 hours on August 3 | |
| | 6 hours on August 5 | |
| | 3 hours on August 7 | 13 hours |
| August 14 | 4 hours on August 10 | |
| | 2.5 hours on August 12 | |
| | 7 hours on August 13 | |
| | 3 hours on August 14 | 16.5 hours |
| August 21 | 4 hours on August 17 | |
| | 4 hours on August 19 | |
| | 5 hours on August 20 | |
| | 3 hours on August 21 | 16 hours |
| August 28 | 4 hours on August 24 | |
| | 3 hours on August 25 | |
| | 4 hours on August 26 | |
| | 4 hours on August 27 | |
| | 4 hours on August 28 | 19 hours |
| September 4 | 4.25 hours on September 1 | |
| | 6 hours on September 2 | |
| | 6 hours on September 3 | |
| | 3.75 hours on September 4 | 20 hours |
| September 11 | 4 hours on September 7 | |
| | 4 hours on September 8 | |
| | 5 hours on September 9 | |
| | 4 hours on September 10 | |
| | 3 hours on September 11 | 20 hours |

| | | |
|---|---|---|
| September 18 | 3 hours on September 14 | |
| | 3.25 hours on September 15 | |
| | 4 hours on September 16 | |
| | 4 hours on September 17 | |
| | 5 hours on September 18 | 19.25 hours |

(Pl. Facts ¶ 16.)  Thus, Morgan worked a total of 226.75 hours at South.  (*Id.* ¶ 17; Def. Resp. ¶ 17.)

## 2.    Morgan's Hours at SpeakEasy

The parties agree that Morgan received four hours of training at SpeakEasy on July 7, 2005, and that he worked for nine hours at SpeakEasy on July 8, 2005.  (Def. Facts ¶ 20.)  The parties strongly disagree as to the nature of that work, however.  Defendants claim that Morgan worked as an independent contractor serving at a private party on July 8, and that he was never on the payroll of SpeakEasy.  (*Id.*)  According to Defendants, Morgan received a flat rate of $100 for his work and did not receive any tips because none of the diners at the private party paid out a separate tip to the servers.  Rather, the restaurant "utilize[d] a fixed price for parties, which includes food, tax, and gratuity."  (*Id.* ¶ 21.)

Morgan admits that he was never on SpeakEasy's payroll, but he insists that he waited tables on July 8 as a server, and not as an independent contractor.  (Pl. Resp. ¶ 20.)  In Morgan's view, there was no private party that day, and the $100 he received constituted tip compensation from the tip pool.  (*Id.* ¶ 21; Morgan Dep., at 140-42.)  Morgan does not explain the basis for this conclusion.  Nor does he provide any documentation to support his additional claim that he worked at SpeakEasy for seven hours on July 15.  (*Id.* ¶ 20; Morgan Dep., at 14-15.)

### E. Morgan's Compensation by Pay Period

The parties have produced a variety of records which they claim support their conflicting views regarding Morgan's payment. In support of their calculations, Defendants have provided the restaurant's Nightly Closing Forms for each night that Morgan worked, and the restaurant's Daily Sales Sheets, both of which reflect the amount of tips owed and paid to each server. (Exs. 7, 8 to Def. Facts.) They have also provided copies of Morgan's meal tickets and check payments. (Exs. 10, 11 to Def. Facts.) Morgan, in turn, has submitted a chart prepared by a paralegal that summarizes these documents, including tips owed, tips paid, "owed" tips paid, hours worked, amount of tips in the tip pool for each week; manual checks received; and meal value. (Rodriguez Aff., Ex. F to Pl. Resp., Attachment 2.)

With this background in mind, the court turns to an assessment of Morgan's compensation in each pay period.

#### 1. June 13 - 26

Defendants claim that for the pay period of June 13 - 26, Morgan received $158 in tips; $100 in wages, which South withheld for payroll taxes; and $33 worth of meal comps, for a total of $291. (Def. Facts ¶ 23; Ex. 7 to Def. Facts, at SPE-000003-05; Ex. 11 to Def. Facts, at SPE-000054.) Morgan admits that he received $158 in tips, but he clarifies that it was only for work performed during the week of June 26 ($78 on June 24 and $80 on June 25). Defendants agree, noting that Morgan was training his first week and did not earn any tips. (Def. Resp. ¶ 2.) Morgan denies receiving $100 in withheld wages, and argues that assuming his gross pay was $258 ($100 in wages plus $158 in tips), his payroll tax withholdings would only amount to $42.47, and not $100. (Pl. Add'l Resp. ¶ 56.) Morgan denies receiving $33 in meal comps, and argues that the prices reflect the retail value of his food ($11 for a "noodle" dish, and $22 for catfish). (Pl. Resp. ¶ 23; Pl. Facts ¶ 34; Ex. 11 to Def. Facts, at SPE-000054.)

#### 2. June 27 - July 10

Defendants claim that for the pay period of June 27 - July 10, Morgan received $394.89 in tips; $140 in wages, which South withheld for payroll taxes; and $40 worth of meal comps, for a total of $574.89. (Def. Facts ¶ 24; Ex. 7 to Def. Facts, at SPE-000006-10; Ex. 11 to Def. Facts, at SPE-000055-56.) Morgan admits that he received $394.89 in tips. According to the Nightly Closing Forms, Morgan received $50 and was owed an additional $95 for work performed on July 1; he received $70 on July 2; he received $20 on July 6; he received $60 and was owed an additional $45 for work performed on July 9; and he received $54.89 on July 10. (Ex. 7 to Def. Facts, at SPE-000006-10.) By these records, Morgan received $254.89 up front, and was owed an additional $140 in tips. On July 10, Morgan received a check, drawn on the SpeakEasy Supper Club account, in the amount of $245.[10] The check indicates that it covered "Tips - Room." (Ex. 10 to Def. Facts, at SPE-000001; Pl. Facts ¶ 22.) Defendants claim that check covered the $140 in tips, plus an additional $105 as "payment for minimum wages owed to Plaintiff." (Def. Add'l Facts ¶ 57.) It is not clear, however, what dates this $105 covered.

Morgan denies receiving $140 in withheld wages, and argues that assuming his gross pay was $534.89 ($140 in wages plus $394.89 in tips), his payroll tax withholdings would only amount to $106.90, and not $140. (Pl. Add'l Resp. ¶ 57.) As for the meal comps, Morgan denies receiving $40 worth and argues that the prices reflect the retail value of his food ($24 for "strip MR" and $16 for "Mac.") (Pl. Resp. ¶ 24; Ex. 11 to Def. Facts, at SPE-000055-56.)

During this pay period, Morgan also trained at SpeakEasy on July 7 and worked a private party there on July 8. Morgan received $100 for this work. (Def. Facts ¶ 21; Pl. Resp. ¶ 21.)

---

[10] It appears that Defendants used a SpeakEasy check because South had run out of checks, and that the SpeakEasy account was later reimbursed. (Def. Add'l Facts ¶ 55.)

### 3. July 11 - 24

Defendants claim that for the pay period of July 11 - 24, Morgan received $283 in tips; $110 in wages, which South withheld for payroll taxes; and $51 worth of meal comps, for a total of $444. Morgan admits that he earned $283 in tips ($45 on July 16; $32 on July 17; $50 on July 18; $72 on July 22; $70 on July 23; and $14 on July 30 for work performed on July 23). (Def. Facts ¶ 25; Pl. Resp. ¶ 25; Ex. 7 to Def. Facts, at SPE-000011-14, SPE-000016; Ex. 11 to Def. Facts, at SPE-000057-58; Ex. F to Pl. Resp., Attachment 2, at Morgan 5-6.) He denies receiving $110 in withheld wages, and argues that assuming his gross pay was $393 ($110 in wages plus $283 in tips), his payroll tax withholdings would only amount to $71.85, and not $110. (Pl. Add'l Resp. ¶ 58.) Morgan denies receiving $51 in meal comps, and argues that the prices reflect the retail value of his food ($24 for "strip," $7 for a house salad, $16 for "Mac," and $4 for asparagus). (Pl. Resp. ¶ 24; Ex. 11 to Def. Facts, at SPE-000057-58.)

### 4. July 25 - August 7

Defendants claim that for the pay period of July 25 - August 7, Morgan received $370 in cash wages, plus an additional $212.21 in tips, for a total of $582.21. (Def. Facts ¶ 26.) Morgan admits that he earned $160 for working a private party at South on July 29, but notes that he only received $100 that evening. The Private Party Daily Sales Sheet confirms that Morgan received $100 but was still owed $60. (Pl. Resp. ¶ 26; Ex. 8 to Def. Facts, at SPE-000180.) Morgan also admits that he earned another $220 for working a private party at South on August 6, but he claims that he was only paid "some of that money that evening and the rest was owed to him." It is not clear how much Morgan received on August 6, but the records reflect that each worker was paid $200. (*Id.*; Ex. 8 to Def. Facts, at SPE-000181.)

As noted, Morgan was owed $60 in tips for work on July 29. He received $40 in tips on July 30; $21 on July 31; $40 on August 3; $33 on August 5; and $18.21 on August 7. Thus, it appears

that Morgan received $152.21 in tips, and was owed an additional $60. (*Id.* ¶ 26; Pl. Resp. ¶ 26; Ex. 7 to Def. Facts, at SPE-000015-20; Ex. F to Pl. Resp., Attachment 2, at Morgan 7-8.)

### 5.    August 8 - 21

Defendants claim that for the pay period of August 8 - 21, Morgan received $130 in wages; $509.36 in tips; and $61.50 worth of meal comps, for a total of $700.86. (Def. Facts ¶ 27.) Morgan admits that he received a check from South on August 14 in the amount of $190. Defendants apparently believe this covered the stated $130 in wages, plus the additional $60 in tips owed from the previous pay period. (*Id.*; Ex. 10 to Def. Facts, at SPE-000002; Pl. Facts ¶ 22.) Morgan asserts, without explanation, that the check compensated him for the wages owed to him for working the private parties on July 29 and August 6. (Pl. Resp. ¶ 27.)

The parties agree that Morgan received $509.36 in tips during this pay period ($66.50 on August 10; $148 on August 12; $60 on August 13; $28 on August 14; $32.50 on August 17; $62.36 on August 19; $90 on August 20; and $22 on August 21). (Ex. 7 to Def. Facts, at SPE-000021-28.) Morgan denies receiving $61.50 in meal comps, and argues that the prices reflect the retail value of his food ($3 for "frittes" on August 14; $31.50 for salmon, chicken, and cornbread on August 17; and $27 for salmon, polenta, and ribs on August 18). (Ex. 11 to Def. Facts, at SPE-000059-61.) It appears, however, that there were two guests for the meals on August 17 and 18, so it is not clear why Morgan was credited with the full amount. (*See* Ex. F to Pl. Resp., Attachment 2, at Morgan10 (crediting Morgan with $15.75 worth of food on August 17, and $13.50 worth of food on August 18).) (Pl. Resp. ¶ 27; Ex. 11 to Def. Facts, at SPE-000059-61.)

### 6.    August 22 - September 4

Defendants claim that for the pay period of August 22 - September 4, Morgan received $200 in cash; $472.50 in tips; and $48 worth of meal comps, for a total of $720.50. (Def. Facts ¶ 28.) Morgan admits that he received $200 in cash for working a private party on September 2. (Pl. Resp. ¶ 28; Ex. 8 to Def. Facts, at SPE-000186.) Morgan also admits that Defendants "credited"

him with $472.50 in tips, but he denies that was paid all of those monies. (*Id.*) The Nightly Closing Forms reflect that Morgan was owed $73 in tips for work on August 24; he was owed $12 in tips for work on August 25, which he was paid on August 27; he was paid $14 in tips for work on August 26, and was owed an additional $78.50; he was paid $49 in tips for work on August 27; he was paid $71 in tips for work performed on August 28, plus an additional $138 (total of $209); he was owed $55 in tips for work performed on September 1; he was paid $75 in tips on September 3; and he was paid $45 in tips on September 4. (Ex. 7 to Def. Facts, at SPE-000029-36; Ex. F to Pl. Resp., Attachment 2, at Morgan11-12.) By these records, Morgan received $404 in tips up front, and was owed an additional $68.50. It is not clear whether Morgan ever received this money.

As for the meals, Morgan once again denies that he received $48 in meal comps, and he argues that the prices reflect the retail value of his food ($16 for tortellini on August 24; $16 for "Mac" on September 1; and $16 for "Mac" on September 3). (Pl. Resp. ¶ 28; Ex. 11 to Def. Facts, at SPE-000062-64.)

### 7.     September 5 - 18

Defendants claim that for the pay period of September 5 - 18, Morgan received $576.27 in tips; $312 in wages, which South withheld for payroll taxes; and $97 worth of meal comps, for a total of $985.27. (Def. Facts ¶ 29.) Morgan denies earning $576.27 in tips. (Pl. Resp. ¶ 29.) With respect to the tips, the records reflect that Andrew received $21 on September 7; he received $79 in tips for work performed on September 9, plus an additional $100 in tips owed for work performed on September 8; he received $62 in tips for work performed on September 10, plus an additional $33 in tips owed from September 8; he received $9 in tips on September 11; he received $28 in tips on September 14; he received $64.27 in tips on September 15; he received $56 in tips on September 16; he received $49 in tips on September 17; and he received $137 in tips on September 18. (Ex. 7 to Def. Facts, at SPE-000037-46; Ex. 11 to Def. Facts, at SPE-000187.) By

these records, Morgan received $638.27. It is not clear whether the extra $62 was an offset to the $68.50 still owed from the previous pay period.

Morgan denies receiving $312 in withheld wages. He also denies receiving $97 in meal comps, and argues that the prices reflect the retail value of his food ($29 for a pork chop, asparagus and "ja/ mash" on September 9; $28 for a pork chop, asparagus, and "garlic mash" on September 9; $20 for "Mac" and asparagus on September 10; and $20 for "Mac" and asparagus on September 14). (Pl. Resp. ¶ 29; Ex. 11 to Def. Facts, at SPE-000065-68.)

**8.    Other Dates**

Defendants assert that Morgan received an additional $44.50 worth of meal comps on certain unspecified dates. Defendants have submitted meal tickets indicating that (1) Morgan had ribs, "ja/ mash" and asparagus, valued at $9; (2) Morgan had chicken and "Mac" valued at $9; and (3) Morgan had cornbread, "pork special" and asparagus valued at $26.50. (Def. Facts ¶ 30; Ex. 11 to Def. Facts, at SPE-000052-53, 000069.)

**F.    Morgan's Lawsuit**

Morgan did not perform any work at South after September 18, 2005. On October 7, 2005, Morgan filed suit against South, SpeakEasy, and Andre seeking to recover wages owed him and other servers pursuant to the FLSA and the IMWL, and charging Defendants with unjust enrichment based on their practice of retaining tips and allowing managers to share in the tip pool. As noted earlier, no other servers opted-in to the class, so Morgan is pursuing this lawsuit solely on his own behalf.

On April 13, 2006, the parties consented to the jurisdiction of the United States Magistrate Judge, and they have now filed cross-motions for summary judgment on all claims.

**DISCUSSION**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering cross-motions for summary judgment, the court must view the evidence in a light most favorable to the party opposing the motion under consideration. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; he must offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001).

Defendants argue that Morgan's FLSA and IMWL claims both fail with respect to his work at South because he received in excess of the minimum wage based on (1) the tips he received as a participant in a valid tip pool; (2) the wages he received as a tipped employee; and (3) the additional payments he received in the form of meals. Defendants insist that Morgan was an independent contractor for SpeakEasy and that he was paid in excess of the minimum wage for his work there. As for the unjust enrichment claim, Defendants argue that the FLSA provides a complete and exclusive remedy, and that Morgan cannot prevail on the merits in any event.

Morgan argues that the tip pool at South was invalid, and that Defendants are not entitled to any offset or credit for the meals he ate while working there. Morgan denies that he was an independent contractor for SpeakEasy, and argues that South, SpeakEasy and Andre were his joint employers – and, thus, jointly liable for his unpaid wages – under the FLSA. Morgan finally contends that he has stated a proper claim for unjust enrichment.

## I.       The FLSA and IMWL

The FLSA and IMWL both require employers to pay their employees a minimum wage for all work performed in a workweek. 29 U.S.C. § 206(a)(1); 820 ILCS 105/4(a). The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The IMWL similarly defines an "employer" as "any individual, partnership, association, corporation, limited liability company, business trust, governmental or quasi-governmental body, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 105/3(c). As of January 1, 2005, the IMWL required that "every employer shall pay to each of his or her employees . . . not less than $6.50 an hour." 820 ILCS 105/4(a). The FLSA sets a minimum wage of "not less than $5.15 an hour," but the parties agree that an employee subject to both the state and federal statutes are entitled to the greater benefits. 29 U.S.C. § 206(a)(1); (Def. Mem., at 6.)

Notwithstanding these minimum wage requirements, employers may pay less than the minimum wage to employees who "customarily and regularly receive[] more than $30 a month in tips." 29 U.S.C. § 203(t). The theory behind this "tip credit" is that employers may use "a portion of the employee's tip income to supplement its minimum wage obligation to the employee, so long as the employee's combined cash wage and tip income meets or exceeds the minimum wage." *Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 711 (N.D. Ind. 1998). To qualify for this tip credit, an employer must demonstrate that (1) the employee was notified of the tip payment plan; and (2) "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m); *Gillis v. Twenty Three East Adams Street Corp.*, No. 04 C 4012, 2006 WL 573905, at *1 (N.D. Ill. Mar. 6, 2006). *See also* 820 ILCS 105/4(c). At all relevant times, an employer could pay a "tipped" employee $3.90 an hour. 820 ILCS 105/4(c) (allowing employer to take a 40% credit towards the minimum wage rate of $6.50 per hour).

## II.     Morgan's "Employer"

18

Before addressing Morgan's wages, the court first considers the identity of his "employer" for purposes of the FLSA and IMWL. Morgan argues that he was simultaneously an employee of both SpeakEasy and South, and that both restaurants and their owner/manager, Andre, are liable for his unpaid wages. Defendants insist that Morgan was employed only by South, and that he worked for one day as an independent contractor for SpeakEasy. Defendants deny that either the two restaurants or Andre share joint responsibility for Morgan's wages.

Neither party addresses joint employment under the IMWL, so the court will discuss the two statutes separately.

A.    FLSA

The court has no problem finding that Andre will be jointly and severally liable for any FLSA violations in this case. The parties agree that she had ownership interests in both restaurants; she had "ultimate authority" over hiring, firing, day-to-day operations, supervision, and scheduling; and she signed the corporations' checks and payroll accounts. (Pl. Facts ¶ 8; Def. Resp. ¶ 8.) *See, e.g., Hernandez v. City Wide Insulation of Madison, Inc.*, No. 05-C-303, 2006 WL 1993552, at *2 (E.D. Wis. July 14, 2006) ("[t]he overwhelming weight of authority is that a corporate officer with operational control . . . is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.") (internal quotations omitted); *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ind. 1991) ("A host of decisions from federal courts of all levels make clear that individuals may have such control over a corporation's affairs that they may be personally liable for FLSA violations.") Defendants claim that Andre was not a corporate officer of the two restaurants but, instead, was employed by Don't Speak, Inc. Citing no authority, they argue that Morgan has not attempted to pierce that corporate veil and, thus, cannot seek to hold Andre personally liable here. (Def. Mem., at 13.) Andre admitted, however, that by April 2005, she was no longer receiving compensation from Don't Speak, raising a question of fact as to whether she was really employed by that company. (Andre Dep., at 100-02.) In any event, the question is not material in that Andre

clearly had sufficient control over South and SpeakEasy, and the particular violations at issue here – i.e., payment of minimum wages – that she may be personally liable for any FLSA violations. *Dole*, 784 F. Supp. at 545.

The court also finds that Morgan was "employed" by SpeakEasy and South during the respective hours he worked at each restaurant. 820 ILCS 105/3(d) (defining "employee" as "any individual permitted to work by an employer in an occupation," except in certain circumstances not applicable here; 29 U.S.C. § 203(e)(1) (with certain exceptions not applicable here, "employee" is defined as "any individual employed by an employer.") (*See also* Defendants' Amended Answer to Complaint, Ex. 5 to Def. Facts (admitting that Morgan was "employed by SpeakEasy, LLC, and The Room of Chicago d/b/a South as a waiter.")); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) ("When a party in a lawsuit makes an admission in its pleadings . . ., it makes a judicial admission that can determine the outcome of that lawsuit.") What is less clear, however, is whether South and SpeakEasy are a single "enterprise" and jointly responsible for Morgan's unpaid wages.

### 1.    Single Enterprise

To be covered by the FLSA, an employee must be "engaged in commerce or in the production of goods for commerce, or . . . employed in an enterprise engaged in commerce."[11] 29 U.S.C. § 206(a)(1). The Act defines an "enterprise engaged in commerce" as one that, among other things, has annual gross revenues of $500,000 or more. 29 U.S.C. § 203(s). It is undisputed that South did not have gross annual revenues of $500,000, but that the $500,000 threshold is met if the revenues of South and SpeakEasy are combined. (Pl. Facts ¶ 4.) Thus, Morgan argues that

---

[11]    The court declines to address Morgan's argument that he satisfies the requirements for individual coverage under the FLSA, as he first raised this theory in his reply memorandum. *See United States v. LaShay*, 417 F.3d 715, 719 (7th Cir. 2005) ("Typically, arguments first raised in a reply brief are considered waived.")

South and SpeakEasy are a single enterprise such that South is a covered employer under the FLSA.[12]  (Pl. Mem., at 9-12.)

South and SpeakEasy will be considered a single enterprise if they (1) performed related activities, (2) through "unified operation" or "common control," and (3) for a common business purpose.  29 C.F.R. § 779.202.  The activities of two companies are "related" if they are "the same or similar."  *Chao v. A-One Medical Servs., Inc.*, 346 F.3d 908, 915 (9th Cir. 2003) (quoting *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518 (1973)).  For example, "activities of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements" will be considered "related."  29 C.F.R. § 779.206.  Whether activities are related "will depend in each case upon whether the activities serve a business purpose common to all the activities of the enterprise, or whether they serve a separate and unrelated business purpose."  *Id.*  "When different business entities are involved, the critical inquiry is whether there is 'operational interdependence in fact.'"  *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 692 (4th Cir. 1990) (quoting *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir. 1984)).  "Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act."  *Id.* at 692-93.  *See also Bowrin v. Catholic Guardian Soc.*, 417 F. Supp. 2d 449, 458 (S.D.N.Y. 2006).

Here, South and SpeakEasy were both engaged in the restaurant business, and considered themselves to be "sister" operations.  SpeakEasy's website specifically invited patrons to visit the website of "our sister restaurant: The Room," and also capitalized on Andre's involvement with South. (http://www.speakeasysupperclub.com/menuchef2bestchicagorestaurant.html.) These facts suffice to satisfy the related activities standard.  *See Chao*, 346 F.3d at 915 (companies that both provided home health services were engaged in related activities).

---

[12]     There is no dispute that SpeakEasy has gross annual revenues greater than $500,000 and is itself a covered employer under the FLSA.  (Pl. Facts ¶ 4.)

"Common control" exists where "the performance of the described activities [is] controlled by one person or by a number of persons, corporations, or other organizational units acting together." 29 C.F.R. § 779.215. "Control" includes "the power to direct, restrict, regulate, govern, or administer the performance of the activities." *Id.* There is no dispute that Jody Andre controlled the operations of both South and SpeakEasy. As noted, she had ownership interests in both restaurants; she had "ultimate authority" over hiring, firing, day-to-day operations, supervision, and scheduling at both restaurants; and she signed both corporations' checks and payroll accounts. (Pl. Facts ¶ 8; Def. Resp. ¶ 8.) Thus, South and SpeakEasy were clearly under common control.

Finally, "a common business purpose is generally found where there are related activities and common control." *Chao*, 346 F.3d at 916. Under Department of Labor ("DOL") regulations, the term "'common business purpose' will encompass activities whether performed by one person or by more than one person, or corporation, or other business organization, which are directed to the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. § 779.213. As noted, South and SpeakEasy considered themselves to be "sister" restaurants and both had the same business objective. Defendants object that the two restaurants were actually competitors, and note that "[w]hen SpeakEasy opened its doors, it acquired so much of South's business that South was force[d] to close its doors as of January 1, 2006." (Def. Resp., at 3.) There is no evidence, however, that SpeakEasy was established in order to compete with South. Indeed, SpeakEasy's website attempted to capitalize on Andre's success at South by boasting that "Jody Andre, owner of The Room and former owner for 7 years of Tomboy, brings her expertise to SpeakEasy." (Pl. Facts ¶ 7.) The mere fact that the owners miscalculated the effect of the new restaurant on the existing one does not preclude a finding that they had a common business purpose as entities performing related activities under common control. *Chao*, 346 F.3d at 916. The court concludes that South and SpeakEasy were a single enterprise under the FLSA.

### 2. Joint Employers

Whether two companies constitute a single enterprise and whether they may be liable as joint employers are "technically separate issues." *Chao*, 346 F.3d at 917. *See also Kaplun v. Lipton*, No. 06-20327-CIV, 2007 WL 707383, at *3 (S.D. Fla. Mar. 5, 2007) ("[A] finding of enterprise coverage does not necessarily compel a finding of joint liability under the FLSA.") "Whether an entity is an employer for the purposes of the FLSA turns on the 'economic reality' of the working relationship." *Dinkins v. Varsity Contractors, Inc.*, No. 04 C 1438, 2005 WL 599979, at *7 (N.D. Ill. Mar. 10, 2005) (citing *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961)). Assuming there are no material facts in dispute, whether a party is a joint employer is a question of law. *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986). Under Department of Labor ("DOL") regulations,

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1)     Where there is an arrangement between the employers to share the employee's services, as for example, to interchange employees; or
>
> (2)     Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3)     Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b). *See also Vega v. Contract Cleaning Maintenance, Inc.*, No. 03 C 9130, 2004 WL 2358274, at *5-6 (N.D. Ill. Oct. 18, 2004).

The Seventh Circuit has not yet addressed the factors a court should consider in determining joint employment under the statute, and the circuits are currently split on the issue. *See Moldenhauer v. Tazewell-Pekin Consolidated Communications Ctr.*, No. 04-1169, 2006 WL 3842086, at *8-9 (C.D. Ill. Dec. 29, 2006) (recognizing circuit split); *Dinkins*, 2005 WL 599979, at

23

*7 (same). The First and Ninth Circuits have applied a four-factor test: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998); *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).

The Second Circuit, on the other hand, has adopted a six-factor test: (1) whether the plaintiff used the entity's premises for his work; (2) whether the labor contractor had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiff performed a discrete line-job that was integral to the entity's process of production; (4) whether responsibility under the labor contract could pass from one subcontractor; (5) the degree to which the entity or its agents supervised the plaintiff's work; and (6) whether the plaintiff worked exclusively or predominantly for the entity. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). *See also Moldenhauer*, 2006 WL 3842086, at *8-9.

Neither party mentions these two tests, but Morgan argues for a finding of joint employment under the DOL regulations. Morgan notes, for example, that Andre owned, operated, and managed both SpeakEasy and South, including hiring and firing employees; directing and supervising employee work; signing the corporations' checks and payroll accounts; and participating in decisions regarding employee compensation and capital expenditures. (Pl. Facts ¶ 8.) Andre admitted that she was the "ultimate authority" at both restaurants; that several employees worked at both restaurants; that the restaurants occasionally shared supplies (napkins, wine glasses, etc.); and that she may have sent a dishwasher or busboy from one restaurant to the other to cover a no-show. (Andre Dep., at 59-60, 77, 88-89.) In addition, Morgan interviewed for a position at SpeakEasy but Andre hired him to work at South, and South once paid him with a SpeakEasy

check, though SpeakEasy was subsequently reimbursed. (Def. Facts ¶ 4; Ex. 10 to Def. Facts, at SPE-000001.)

Defendants deny that Morgan performed work that simultaneously benefitted both SpeakEasy and South, or that "his one day of work at SpeakEasy was in the interest of South." (Def. Resp., at 3.) In Defendants' view, the two restaurants were actually competitors, and "[w]hen SpeakEasy opened its doors, it acquired so much of South's business that South was force[d] to close its doors as of January 1, 2006." (*Id.*) Defendants also insist that, at most, South and SpeakEasy may be deemed joint employers only for the week of July 4-10, because that is the only week during which Morgan provided services to both restaurants. (*Id.* at 4.)

The court finds the *Bonnette* analysis most appropriate to the facts of this case, but is satisfied that under any view of the statutory regulations South and SpeakEasy were Morgan's joint employers for purposes of the FLSA with respect to any week during which Morgan worked for both restaurants. During most weeks, however, Morgan worked only for South, and there is no evidence that he performed any services benefitting SpeakEasy such that he was concurrently "employed" by both restaurants. Morgan correctly notes that the two entities were not completely disassociated with respect to his employment, as evidenced by the fact that (1) he applied for a position with SpeakEasy but was hired to work at South, and (2) of the two checks he received for his work at South, one was drawn on a SpeakEasy check. South reimbursed SpeakEasy for that payment, however, and Morgan concedes that he was never on the SpeakEasy payroll. Nor is there any evidence that Andre ever asked Morgan to work at SpeakEasy in order to cover for a server who did not show up to work. On these facts, South and SpeakEasy are not properly viewed as Morgan's joint employers under the FLSA for the weeks during which he performed services only for South.

**B.    IMWL**

Courts have held that the IMWL parallels the FLSA, and that the same analysis generally applies to both statutes. *See Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004). The general Illinois Supreme Court test for joint employment is whether "two or more employers exert significant control over the same employees – where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." *Village of Winfield v. Illinois State Labor Relations Bd.*, 176 Ill. 2d 54, 60, 678 N.E.2d 1041, 1044 (1997) (internal citations and quotations omitted). Relevant factors to consider include "the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." *Id.* (internal quotations omitted).

The Illinois Supreme Court has not yet determined whether this test applies to cases under the IMWL, but it recently applied the test to a case involving the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq. See Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 117, 838 N.E.2d 894, 904 (2005). In that case, the court held that two corporate entities were not joint employers where they were "distinct corporate entities that operated out of separate facilities in separate cities; were formed at different times; and had separate employees, separate management, separate bank accounts, separate collective bargaining agreements, and separate retirement plans." 217 Ill. 2d at 117. Here, South and SpeakEasy were separate companies operating out of two different facilities, and they were formed at different times. It is true that Andre owned and operated both SpeakEasy and South; supervised employees and day-to-day operations at both restaurants; and hired and fired employees and set their work schedules at both restaurants. To the extent that Morgan worked only at South during most weeks, however, the court concludes that South and SpeakEasy were joint employers under the IMWL only with respect to workweeks during which Morgan performed services as a server at both restaurants.

26

For reasons similar to those stated above with respect to the FLSA, the court concludes that Andre may be jointly and severally liable for any violations under the IMWL. *See Dole*, 784 F. Supp. at 545 ("A host of decisions from federal courts of all levels make clear that individuals may have such control over a corporation's affairs that they may be personally liable for FLSA violations."); *Ladegaard*, 2004 WL 1882449, at *4 (analysis under the FLSA generally applies to cases under the IMWL).

## III.    Morgan's Wages

Having determined that South and SpeakEasy were a single enterprise and, at times, Morgan's joint employer under the FLSA and IMWL, the court next considers whether Morgan received the minimum wage for all his work at each restaurant.

Before turning to the minimum wage issue, the court first clarifies an apparent dispute as to the proper time period for calculating wages. Defendants maintain that they paid Morgan the minimum wage, and have provided a summary chart of his payments on a two-week pay period basis. For example, Defendants claim that for the pay period between July 11 and 24, 2005, Morgan received a total of $444 for 27 hours of work. Morgan argues that his minimum wage payments must be calculated on a workweek basis, even if he is only paid in two-week periods. The court agrees that minimum wage is to be calculated on a workweek basis. *See O'Brien v. Encotech Constr.*, No. 00 C 1133, 2004 WL 609798, at *6 (N.D. Ill. Mar. 23, 2004). That said, Morgan does not cite any authority against paying those wages on a two-week basis. Thus, once the appropriate minimum wage is determined, Defendants must show that they paid Morgan that wage for every hour worked in each week, though his actual receipt of the monies need not be on a weekly basis. In the example above, Defendants must show that at the time of payment, Morgan received 10 hours times the applicable minimum wage for the week ending July 17, and 17 hours times the applicable minimum wage for the week ending July 24. Defendants' argument that "[i]f

one were to total up all of Plaintiff's compensation from working at South, it would exceed $18.50 an hour," is not instructive. (Def. Mem., at 10.)

### A. South

The parties agree that Morgan worked a total of 226.75 hours for South between June 14 and September 18, 2005. Defendants insist that they paid Morgan, a tipped employee, $1,362 in wages, though he was only entitled to $884.33 ($3.90 x 226.75 hours). Defendants argue that Morgan also received additional compensation in the form of meals, less $662 for payroll taxes. Morgan denies that he received any wages at all, and disputes the validity of the tip pool, the meal compensation plan, and the payroll tax withholdings.

#### 1. The Tip Pool

Morgan acknowledges that he participated in a tip pool, but he contends that it was invalid and that he is therefore owed $1,473.88 in wages ($6.50 x 226.75 hours). According to Morgan, Defendants were not entitled to pay the tip credit wage because they (1) allowed managers to participate in the tip pool; (2) did not notify him that his wages were being decreased under the tip credit plan; and (3) unlawfully retained employees' tips.

##### a. Management Participation

The FLSA expressly prohibits employers from participating in employee tip pools. "Congress, in crafting the tip credit provision of section 3(m) of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employees' tips." *Chung v. New Silver Palace Restaurant, Inc.*, 246 F. Supp. 2d 220, 230 (S.D.N.Y. 2002). *See also Sorensen v. CHT Corp.*, Nos. 03 C 1609, 03 C 7362, 2004 WL 442638, at *6 (N.D. Ill. Mar. 10, 2004). Where management employees participate in a tip pool, the pool is invalid. *See Ayres v. 127 Restaurant Corp.*, 12 F. Supp. 2d 305, 308-09 (S.D.N.Y. 1998) (tip pool violated FLSA where general manager, who had authority to suspend, hire and fire employees and analyze payroll costs, was allowed to participate in the pool).

28

Morgan argues that South's tip pool was invalid because managers David Williamson and Keila Herrington shared in the pool. (Pl. Resp., at 7.) Defendants agree that Williamson and Herrington participated in the tip pool, but argue that they were "tipped employees" and not managers. 29 U.S.C. § 203(t) (defining tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."); *McClain v. Leona's Pizzeria, Inc.*, 222 F.R.D. 574, 576 n.1 (N.D. Ill. 2004). Defendants admit that senior servers had more seniority and experience than regular servers, as well as greater responsibilities within the restaurants, but stress that their duties included important customer service functions, such as serving food and drinks to tables, greeting customers, and checking on tables during the dinner service. (Def. Mem., at 8-10; Def. Resp., at 6.) Defendants also note that senior servers had no authority over employee hiring, firing, and scheduling. Courts have found that employees with similar duties are entitled to share in tip pools.

In *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998), for example, the Sixth Circuit held that "hosts" properly shared in a tip pool "because they sufficiently interact with customers in an industry (restaurant) where undesignated tips are common." *Id.* at 301. The court explained that hosts "perform important customer service functions: they greet customers, supply them with menus, seat them at tables, and occasionally 'enhance the wait.'" *Id.* Hosts were not the "primary customer contact," but the court found that they had "more than de minimis interaction with the customers" sufficient to qualify them for tips. *Id. See also Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 800-01 (E.D. Ark. 1990) (upholding a mandatory tip pool where servers tipped out to a maitre d' whose responsibilities included setting up the dining room, greeting and seating customers, serving the first drink to customers, and assisting servers in serving customers as needed).

Morgan argues that senior servers performed duties that clearly establish their status as "employers" who were "acting directly or indirectly in the interest of [South] in relation to [the]

29

employee[s]." 29 U.S.C. § 203(d); 820 ILCS 105/3(c). Specifically, senior servers helped with closing; supervised employees' work; handled complaints; operated the restaurant's safe; handled money; completed the Nightly Closing Forms; sent employees home; contacted Andre when the restaurant needed additional staff or supplies; took inventory; and maintained the restaurants' cleanliness. (Pl. Resp. ¶¶ 14, 16; Pl. Facts ¶ 23.) According to Williamson, he had keys to the restaurant and "was customarily the highest ranking employee at the restaurant when [he] was working and was generally in sole charge of the restaurant on those work days." (Williamson Aff. ¶ 4; Pl. Resp. ¶ 17.) Herrington, moreover, had a business card identifying her as a "manager."

Based on the totality of the circumstances, the court concludes that senior servers constituted "tipped employees" and not "employers" under the FLSA and IMWL. It is true that senior servers exercised some control over employees, such as sending them home, requesting additional staff, and supervising their work. They had no authority, however, over hiring, firing, or scheduling. Nor did they determine the rate or method of employee payment, or maintain employment records beyond performing clerical duties such as completing the Nightly Closing Forms. *Cf. Freemon v. Foley*, 911 F. Supp. 326, 331 (N.D. Ill. 1995) (FLSA applies where individual "possesses control over the aspect of employment alleged to have been violated.") Herrington's business card did identify her as a manager, but there is no evidence that her actual duties differed from those of other senior servers such as Williamson. At most, these senior servers were low-level supervisors who cannot be considered employers under the FLSA and IMWL. *See Hernandez*, 2006 WL 1993552, at *3 (supervisor was not an "employer" where he could hire employees and had some control over their work schedules, but he did not determine the rate or method of payment and performed only clerical duties related to employment records); *Dole*, 751 F. Supp. at 802 (rejecting the argument that "any person who has any supervisory duties over other employees, no matter how minimal, becomes an 'employer' within the meaning" of the FLSA).

On the other hand, it is undisputed that Williamson and Herrington both participated in the tip pool, and the court finds that they had sufficient customer interaction to establish that they were engaged in an occupation in which they "customarily and regularly receive[d] . . . tips." 29 U.S.C. § 203(t).  As noted, Williamson and Herrington helped serve food and drinks to tables, greeted customers, and checked on tables during the dinner service.  Thus, the tip pool was not invalid by virtue of the fact that Williamson and Herrington participated in it.

### b.    Notice

Morgan argues that the tip pool is nonetheless invalid because Defendants failed to notify him that they would be taking a tip credit against his wages.  Section 203(m) of the FLSA requires that an employee "must be informed by the employer of the [tip credit] provisions."  29 U.S.C. § 203(m).  Courts have interpreted this provision as requiring that an employer "must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligation." *Kilgore*, 160 F.3d at 298.  *See also Davis*, 38 F. Supp. 2d at 718-19.  An employer need not, however, "explain" the tip credit to an employee, but may present him with written materials setting forth the relevant information.  *Id.*

Morgan argues that Andre never informed him that Defendants were using his tips to offset their minimum wage requirements.  He notes Andre's testimony that upon hiring new employees, she explained to them the restaurant's operations and procedures, and discussed how many shifts they wanted to work; what their first day would be like; what to wear; when training would occur and by whom; and what they would learn in their first few days.  (Pl. Facts ¶ 11.)  Notably absent from this list, Morgan says, is any mention of the tip credit provisions.  (Pl. Mem., at 4.)  As for written materials, Andre admits that she merely distributed a handout explaining the restaurants' opening and closing procedures.  (Pl. Facts ¶ 11.)

Defendants argue that Andre's testimony does not include every topic that she discussed with new hires.  According to Defendants, Morgan's counsel asked Andre about her new hire

31

discussions on a "general basis," and did not ask whether she had provided an exhaustive list. Nor did Morgan's counsel expressly ask Andre whether she informed employees of South's tip credit wage. (Def. Resp., at 5; Def. Resp. to Add'l Facts ¶ 1.) Defendants insist that Andre did inform Morgan of the tip credit policy and, thus, South was entitled to pay him the tip credit rate of $3.90 per hour. (*Id.*)

Given the parties' conflicting positions, the court finds a question of fact as to whether Morgan received proper notice of South's tip credit policy. Morgan claims that he did not; Defendants claim that he did. The parties' motions for summary judgment with respect to whether South was entitled to pay Morgan a tip credit wage of $3.90 per hour are both denied.

### c. Tip Retention

Before leaving the tip pool issue, the court notes that it also finds a question of fact as to whether Defendants improperly retained tips without distributing them to employees. Morgan claims that Defendants retained a portion of his tips on both a daily and a weekly basis. On July 1, 2005, for example, Morgan and other servers collected a total of $273 in tips. Defendants, however, only distributed $135 to the servers. (Pl. Facts ¶ 30.) During the workweek ending July 3, 2005, moreover, servers earned a total of $553 in tips, but Defendants only distributed $400 to them. (*Id.* ¶ 31.) Morgan claims that this happened on numerous occasions throughout his employment at South.

Defendants explain that many customers left tips on their credit cards, and that on occasion, the restaurant did not have enough petty cash on hand to pay all of the tips left by diners in an evening. When that occurred, Defendants made a notation on the Nightly Closing Form and Daily Sales Sheet indicating the amount of tips still owed to each server. According to Defendants, the servers were then paid in full at a later date. (Def. Resp., at 8; Def. Resp. ¶¶ 21, 30; Pl. Facts ¶ 21.)

Neither party cites any case law or regulation addressing when an employee must receive his earned tips. The DOL regulations provide some guidance on the timing of payments with

32

respect to overtime, stating that such wages need not be paid on a weekly basis. Rather, "overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." 29 C.F.R. § 778.106. It is reasonable to infer, by analogy, that employees must receive their earned tips for a particular workweek on the regular pay day for the period in which such workweek ends. *See also Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1578-79 (11th Cir. 1985) ("The employee must *actually receive* the minimum wage each pay period.") (emphasis in original). Absent further documentation, the court cannot determine whether Defendants retained some portion of the servers' earned tips such that the entire tip pool was invalid, or whether they properly paid all outstanding tips by the end of each relevant workweek. Summary judgment is inappropriate on this issue.

### 2.    The Meal Compensation Policy

Defendants argue that in addition to his tips, Morgan received compensation in the form of meals when he worked at South. The FLSA and IMWL both allow employers to deduct from an employee's wages the "reasonable cost" of meals they customarily furnish to that employee. 29 U.S.C. § 203(m); 29 C.F.R. § 531.29; 820 ILCS 105/3; 56 Ill. Admin. Code § 210.200(b). The reasonable cost of meals cannot be more than the actual cost and must not include any profit to the employer. 29 C.F.R. § 531.3; 56 Ill. Admin. Code § 210.200(b). Employers do not need to keep itemized records of the cost of furnishing meals to individual employees, but they must "maintain records to substantiate the cost of furnishing a *class* of non-cash benefits under § 203(m)." *Herman v. Collis Foods, Inc.*, 176 F.3d 912, 914 (6th Cir. 1999) (citing 29 C.F.R. § 516.27(a)) (emphasis in original). "[T]he burden of proving that a deduction from wages represents the reasonable cost of the meals furnished is on the employer." *Id.* at 920 (citing *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 475 (11th Cir. 1982)).

Defendants claim that they furnished Morgan with $375 in meals during his employment at South, and that they properly deducted this amount from his wages. (Def. Mem., at 10.) According

to Defendants, South maintained contemporaneous records of Morgan's meals, which show the actual cost of the food items and their production time, with no additional profits to the restaurant. (*Id.*; Def. Resp., at 9; Ex. 11 to Def. Facts.) Morgan does not dispute that Defendants have meal tickets itemizing the meals he ate at South. He argues, however, that the prices reflect the retail cost of the meals and not their actual cost to Defendants. (Pl. Mem., at 6.) In support of this assertion, Morgan cites David Williamson's affidavit stating that the monetary amounts of meals on the meal tickets "appear to be the retail, or menu price, of the food." (Williamson Aff. ¶ 14.) Morgan also notes Andre's testimony that she does not know the actual cost of the meals he ate.

As noted, Defendants bear the burden of demonstrating that the deduction from wages represents the reasonable cost of the meals. Here, the court has before it Morgan's assertion that the prices on his meal tickets reflect the retail cost of the food, and Defendants' corresponding denial. Defendants, however, have not provided any support for their position. They do not have any menus available to compare the listed price of Morgan's meals. Nor did they submit paychecks showing meal-credit deductions, or records reflecting the price of all food purchases. *Cf. Herman*, 176 F.3d at 915-16, 919 (employer complied with recordkeeping requirements of FLSA meal-credit provisions by "show[ing] the meal-credit deduction on the weekly paycheck of each of its employees," and "maintain[ing] records of the cost of all of the food it purchased, whether such food was for consumption by employees or by customers," and these records were used by an "expert witness who prepared a report supporting the meal-credit plan.") Indeed, Defendants have not provided any reasonable substantiation for the meal prices on the meal tickets, aside from their bald assertion that the prices reflect the actual cost. That is not sufficient for purposes of the FLSA. *See Donovan*, 676 F.2d at 475 ("[A]n employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the record-keeping provisions of the FLSA . . . does not satisfy the employer's burden of proving reasonable cost.") Morgan's motion for summary judgment on the invalidity of Defendants' meal credit plan is granted.

### 3.       The Payroll Tax Withholding

Defendants claim, and Morgan disputes, that they withheld monies from Morgan's wages to cover payroll taxes.  The DOL regulations expressly state that "[t]axes which are assessed against the employee and which are collected by the employer and forwarded to the appropriate governmental agency may be included as 'wages' . . . . This principle is applicable to the employee's share of social security and State unemployment insurance taxes, as well as other Federal, State, or local taxes, levies, and assessments."  29 C.F.R. § 531.38.  No deduction may be made, however, "for any tax or share of a tax which the law requires to be borne by the employer."  *Id.*  Defendants claim that they withheld a total of $662 of Morgan's wages for his share of payroll taxes, and have submitted a 2005 W-2 Wage and Tax Statement to that effect.  (Ex. 15 to Def. Facts.)

Morgan disputes that South withheld any amounts for payroll taxes, noting that Andre did not testify to such an arrangement at her deposition.  Morgan also notes that the W-2 Form reflects that he earned wages, tips, and other compensation totaling $3,719.53, but that Defendants' statement of facts indicates that they paid Morgan $4,334.23.  (Def. Add'l Facts ¶ 63.)  Defendants assert in a footnote that this discrepancy was "[d]ue to an oversight in accounting," but they provide no underlying documentation demonstrating the manner in which South calculated Morgan's tax withholding obligations.  (Def. Resp., at 9 n.3.)  In addition, the W-2 Form does not include Morgan's social security number, and the IRS has no record that Defendants paid any payroll taxes on Morgan's behalf in 2005.  (Ex. A to Pl. Motion to Supplement; Pl. Supp. to Add'l Facts ¶ 13.) *See Frenel v. Freezeland Orchard Co.*, No. Civ. A 87-278-A, 1988 WL 58061, at *4 (E.D. Va. Apr. 8, 1988) (payroll tax deductions allowed only if the employer shows that "the sums withheld were forwarded to the Internal Revenue Service.")

At the same time, Morgan has not submitted his 2005 tax return reflecting the monies earned and/or payroll taxes deducted in connection with his work at South that year.  In fact, Andre

submitted an affidavit stating that Morgan refused to provide South with his relevant payroll information, including his social security number and address, despite being asked several times. (Andre Aff., Ex. 3 to Def. Facts, ¶ 9.)  In addition, it appears that after South ceased operations in January 2006, the restaurant entered into a payment plan with the IRS regarding outstanding payroll taxes due, including tax payments for 2005.  It is not clear whether this payment plan "superseded any wage and tax statements issued by the IRS for South," as Defendants claim. (Def. Resp. to Supp. to Add'l Facts ¶ 13.)

Nor can the court determine whether Defendants deducted more than Morgan actually owed in taxes based on his income.  To the extent there is a question of fact as to whether Defendants were entitled to pay the tip credit wage of $3.90 per hour, there is also a question of fact as to the proper amount of the corresponding payroll tax deductions.  The parties' motions for summary judgment are both denied as to the issue of payroll tax withholding.

In sum, the court finds issues of fact as to whether Defendants (1) were entitled to pay Morgan the $3.90 tip credit wage, and (2) properly withheld amounts as payroll taxes.  Defendants may not claim any credits for meals they supplied to Morgan, and will need to establish that they satisfied the minimum wage obligations independent of those meals.  Defendants will also need to demonstrate that they paid Morgan the requisite wages from monies that are separate from the tip pool funds.

**B.      SpeakEasy**

The parties agree that Morgan received four hours of training at SpeakEasy on July 7, 2005, and that he worked for nine hours at SpeakEasy on July 8, 2005.  (Def. Facts ¶ 20.)  Defendants claim that Morgan worked on July 8 as an independent contractor serving at a private party, and he received a flat rate of $100 for his work.  According to Defendants, Morgan did not receive any tips because none of the diners at the private party paid out a separate tip to the servers; rather, the restaurant "utilize[d] a fixed price for parties, which includes food, tax, and gratuity."  (*Id.* ¶ 21.)

36

Morgan insists that he waited tables on July 8 as a server. He denies working at a private party that day, and claims that the $100 he received constituted tip compensation from the tip pool. (Morgan Dep., at 140-42.) Morgan does not explain the basis for this conclusion, but neither do Defendants submit any documentation supporting their contrary assertion. In any event, it is clear that Morgan was paid in excess of $6.50 per hour for this work, as required by statute (13 hours x $6.50 = $84.50, compared with Morgan's actual payment of $100). Defendants' motion for summary judgment on this issue is therefore granted.

This does not, however, resolve Morgan's claim for wages from SpeakEasy. Morgan insists that he worked an additional seven hours at SpeakEasy on July 15. Defendants deny this assertion, but neither party has provided any documentation or other support allowing a determination either way. Defendants have submitted a time card Morgan completed for his work on July 8, and there is no corresponding time card for July 15. (Ex. 9 to Def. Facts.) That said, the parties agree that Morgan stopped keeping time cards after the first few weeks of his employment, and Defendants have not submitted any records from SpeakEasy establishing that he did not in fact work that day. (Def. Facts ¶ 8; Pl. Resp. ¶ 8.) The court thus finds a question of fact as to whether Morgan worked at SpeakEasy on July 15, and the parties' motions for summary judgment on this issue are denied.

IV.    **Liquidated Damages**

Morgan argues that, in the event he is successful on his wage claims, he is entitled to liquidated damages. Section 216(b) of the FLSA provides that employers who violate the statute's minimum wage requirements are liable "in the amount of [the employee's] unpaid minimum wages . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A court may award no liquidated damages, however, if it determines that the employer, while acting in good faith, reasonably believed that its conduct was consistent with the law. 29 U.S.C. § 260. "While doubling a plaintiff's recovery is discretionary, there is 'a strong presumption in favor of doubling.

. . . Double damages are the norm, single damages the exception, burden on the employer.'" *Alice v. GCS, Inc.*, No. 05 C 50132, 2006 WL 2644958, at *7 (N.D. Ill. Sept. 14, 2006) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986)).

Morgan first claims that Defendants failed to plead the good faith affirmative defense to liquidated damages, and that he is entitled to such damages as a matter of law. (Pl. Mem., at 7.) Defendants disagree, noting their affirmative defense that "Plaintiff has failed to plead sufficient facts to set forth a claim for liquidated and punitive damages against Defendants." (Def. Resp., at 13; Amended Answer, Third Affirmative Defense, Ex. 5 to Def. Facts.) The court finds Defendants' pleading sufficient and declines to hold that they have waived the right to assert a good faith defense.

Morgan also claims that Defendants have not met their burden of demonstrating good faith in this case. "The good faith defense requires proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act." *Castro v. Chicago Housing Auth.*, 360 F.3d 721, 730 (7th Cir. 2004). Defendants bear the burden of proof as to the mitigation defense, and the burden is "substantial." *See Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995). Having found an issue of fact as to whether Defendants in fact failed to pay Morgan the required minimum wages, the court denies summary judgment on the issue of liquidated damages as well.

## V.     Unjust Enrichment

The parties finally seek summary judgment on Morgan's unjust enrichment claim. This claim "is predicated on [Morgan's] entitlement to tips left for him by Defendants' customers but which Defendants took from him pursuant to a scheme that violated federal law." (Pl. Mem., at 12.) Morgan concedes that the only case to address this issue, *Sorensen v. CHT Corp.*, 2004 WL 442638 (N.D. Ill. 2004), concluded that an unjust enrichment claim based on the same factual

assertions as an FLSA claim is preempted by the federal statute. *Id.* at *5-7. He argues, however, that *Sorensen* was incorrectly decided.

### A. The *Sorensen* Decision

The plaintiffs in *Sorensen* were current and former employees of the defendants who sought to recover unpaid minimum wages and overtime pay under the FLSA and IMWL for work they performed as waiters and servers. Specifically, the plaintiffs alleged that the defendants "paid them 'only a fractional amount of the tips they actually received . . . as part of Defendants' tip pooling arrangement.'" 2004 WL 442638, at *1. According to the plaintiffs, the defendants used the excess tip money to pay the salaries of non-tipped employees, and to fund certain charitable activities. *Id.* In their lawsuit, the plaintiffs claimed that the defendants willfully violated the FLSA and IMWL by unlawfully using a tip credit against their minimum wage obligations, and then failing to pay their waiters minimum and overtime wages. *Id.* The plaintiffs also alleged that the defendants were unjustly enriched by their practice of using excess tip monies to pay non-tipped employees and fund charitable events. *Id.* at *2.

The defendants moved for judgment on the pleadings on the unjust enrichment claim arguing, among other things, that the FLSA provided a complete and exclusive remedy for the alleged violations. *Id.* at *3. The plaintiffs argued that the remedy they sought – i.e., disgorgement of tip income – was not available under the FLSA, which only provided for recovery of minimum wages. *Id.* at *5. *Cf. Tombrello v. USX Corp.*, 763 F. Supp. 541, 544 (N.D. Ala. 1991) (common law claims for "wrongful refusal to pay" were "nothing more than claims for wages [which] must be brought under the Fair Labor Standards Act . . . the exclusive remedy for enforcing these rights.") The court disagreed, noting that the FLSA specifically addresses the situation where "an employer essentially participates in a tip pooling arrangement by retaining a portion of the money, and provides that the appropriate relief is to deny the employer the use of the tip credit arrangement." *Id.* at *6. The court conceded that state law claims are not automatically preempted by the FLSA,

but found it significant that the plaintiffs claimed to be seeking a different remedy under federal and state law. *Id.* (comparing *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551 (D. Md. 2003) (declining to dismiss claim for negligent failure to comply with the FLSA where the plaintiff also alleged a claim for violation of the FLSA, but sought "identical damages under both federal and state law.")) The court thus concluded that "the common law [unjust enrichment] claim is preempted by the FLSA and not properly before this court." *Id.* at *7.

### B. Morgan's Lawsuit

The facts of this case are directly on point with those at issue in *Sorensen*. Morgan's unjust enrichment claim is based on the same factual assertions as his FLSA claims, and the FLSA clearly addresses the situation where an employer fails to pay minimum wages to an employee and/or unlawfully retains tips from a tip pool. *See* 29 U.S.C. §§ 203(m), 206(a)(1). The court disagrees that the FLSA provides no basis for recovering "the difference between the tips that Defendants tendered back to Plaintiffs and the tips that were illegally retained by Defendants." (Pl. Mem., at 14.) The case Morgan cites for this proposition, *Balducci v. Chesterfield County, Virginia*, 187 F.3d 628 (Table), 1999 WL 604040 (4th Cir. 1999), is distinguishable because the plaintiff in that case could not establish any minimum wage violations under the FLSA. Thus, "[a]ny dispute between these two parties about the number of hours for which the employees' salary was intended to compensate them is not cognizable under the FLSA, but instead should be pursued under state contract law." *Id.* at *7. Here, conversely, Morgan must establish a violation of the FLSA in order to pursue any claim for unjust enrichment. *See Sorensen*, 2004 WL 442638, at *7.

*Williamson v. General Dynamics Corp.*, 208 F.3d 1144 (9th Cir. 2000) is also inapposite. The plaintiffs in that case failed to join a settlement in a class-action lawsuit regarding the defendant's failure to pay overtime wages because the defendant allegedly threatened to harm their jobs and lied to them about the viability of their careers if they stayed. *Id.* at 1147. The plaintiffs

40

filed separate lawsuits alleging, among other things, "wage fraud" and "career fraud." *Id.* at 1148. The district court found that the FLSA preempted the common law fraud claim, but the Ninth Circuit reversed. The court held that the defendant's fraudulent conduct was not covered by an FLSA provision, so it was not preempted by the statute. *Id.* at 1151-54. In reaching this conclusion, the court confirmed that "[c]laims that are directly covered by the FLSA (such as overtime and retaliation disputes) must be brought under the FLSA," but that the career fraud claims were not covered by the statute. *Id.* at 1154. *See also Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir. 1990) (the FLSA did not preempt application of California's overtime pay laws to maritime employees who were specifically excluded from coverage under the Act).

As explained earlier, Morgan's claim for unjust enrichment is directly covered by the FLSA. To the extent Morgan has raised identical arguments against preemption that the *Sorensen* court carefully considered and rejected, the court finds no basis for disagreeing with *Sorensen* and declines to do so here. *See Choimbol v. Fairfield Resorts, Inc.*, No. 2:05 CV 463, 2006 WL 2631791, at *4-6 (E.D. Va. Sept. 11, 2006) (dismissing unjust enrichment claim where it "merely recasts the central claim in this case: violation of the FLSA," and noting "Congress' clear intent that the FLSA be the sole remedy available to employees for enforcement of whatever rights he may have under the FLSA.") (internal quotations omitted). Defendants' motion for summary judgment on Morgan's unjust enrichment claim is granted.

## **CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. 43] and Morgan's Motion for Summary Judgment [Doc. 45] are both granted in part and denied in part. Morgan's Motion for Leave to Supplement Local Rule Statements of Material Fact [Doc. 68] is granted.

ENTER DATE: 9/20/2007

_____

NAN R. NOLAN
United States Magistrate Judge